USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/20/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
FEDERAL DEPOSIT INSURANCE : 
CORPORATION, *as receiver for Guaranty* : 
*Bank* : 
 : 
                           **Plaintiff,** :   1:15-cv-06560
 : 
        -against- : 
 : 
THE BANK OF NEW YORK MELLON : 
 : 
                           **Defendant.** : 
------------------------------------------------------------x
FEDERAL DEPOSIT INSURANCE : 
CORPORATION, *as receiver for Guaranty* : 
*Bank,* : 
 : 
                           **Plaintiff,** :   1:15-cv-06570
 : 
        -against- : 
 : 
U.S. BANK NATIONAL ASSOCIATION, : 
 : 
                           **Defendant.** : 
------------------------------------------------------------x
FEDERAL DEPOSIT INSURANCE : 
CORPORATION, *as receiver for Guaranty* : 
*Bank,* : 
 : 
                           **Plaintiff,** :   1:15-cv-06574
 : 
        -against- :   **OPINION & ORDER**
 : 
CITIBANK, N.A., : 
 : 
                           **Defendant.** : 
------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiff Federal Deposit Insurance Corporation acting as receiver for Guaranty Bank ("FDIC-R") brings this action against Defendants The Bank of New York Mellon ("BNY"), U.S.

Bank National Association, and Citibank, N.A. (individually, "BNY," "U.S. Bank," and "Citi"; collectively "Defendants") for Breach of Contract, violation of the Streit Act, and violation of the Trust Indenture Act (TIA). Compl., ECF No. 1. On September 30, 2016, the Court dismissed the Complaint for lack of subject matter jurisdiction holding that Plaintiff lacked standing to sue Defendants. ECF No. 38. On October 14, 2016 Plaintiff sought reconsideration. ECF No. 39. The Court granted reconsideration in part, permitting Plaintiff to amend its complaint to resolve the standing issue. *See* ECF No. 47. Plaintiff filed its Amended Complaint on December 8, 2017. ECF No. 51. Defendants have now moved to dismiss the Amended Complaint. ECF No. 64. For the reasons outlined below, Defendants' Motion to Dismiss is **GRANTED**.

## BACKGROUND

### I. Securitization Generally

This matter stems from conduct of a Trustee of Residential Mortgage Backed Securities (RMBS). To create RMBS, mortgage loans are pooled together in a trust, which issues securities that represent interests in cash flows on a pool of mortgages. Am. Compl. ¶ 39, ECF No. 50. The securitization process begins when an acquirer of mortgage loans (a "sponsor" or "seller"), such as Countrywide, sells a large pool of such loans to a depositor, which is typically a special-purpose affiliate of the sponsor. *Id.* at ¶ 40. The depositor then conveys the pool of loans to a trustee, in this case BNY, pursuant to a Pooling and Service Agreement ("PSA"). *Id.* at ¶ 41. Each securitization contains "tranches" of interests in payments made by borrowers on the loan. *Id.* Each tranche has a different level of risk and reward, and its rating is issued by a nationally recognized credit agency. *Id.* at ¶ 44. The most senior tranches have higher ratings and are entitled to payment in full first, but, junior tranches, which have lower ratings and are paid after

senior tranches, offer higher potential rewards. *Id.* Any shortfalls in principal and interest payments are allocated first to junior tranches. *Id.* As payments from mortgage borrowers are the source of funds to pay certificate holders, the credit quality of the security turns on the credit quality of the underlying loans. *Id.* at ¶ 45.

The trust is tasked with issuing certificates representing tranches, which are then sold to an underwriter who re-sells the certificates at a profit to investors. *Id.* at ¶ 41. The sponsor earns profit based on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans. *Id.* The PSA for each trust requires a "servicer" to manage the collection of payments on the mortgage loans. *Id.* at ¶ 42. "The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties." *Id.* The trustee is responsible for delivering monthly remittance reports to holders of certificates, which describe the performance of underlying loans and compliance with the PSA. *Id.* at ¶ 43. The servicer provides data for these reports.

## II. Plaintiff's Allegations

At bottom, Plaintiff alleges that BNY abdicated its duties as the trustee to certificateholders such as Plaintiff in five different ways, running afoul of both the PSAs and relevant federal law. *Id.* at ¶ 2. First, BNY allegedly failed to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying incomplete mortgage loan files. *Id.* at ¶ 10. As a result, Defendant BNY did not ensure that the rights, title, and interest in the mortgage loans were perfected and properly conveyed, and the

3

sponsor was not required to substitute compliant loans for the loans with incomplete files or to repurchase the loans that ultimately caused Plaintiff significant losses. *Id.* In support of its allegations, Plaintiff notes that BNY admitted publicly that it was aware of Countrywide's pervasive failure to deliver complete mortgage files, and that BNY commenced foreclosure actions between 2005 and 2008, which highlighted pervasive document delivery issues. *Id.* at ¶¶ 86-88.

Second, BNY purportedly failed to notify certificateholders of any breach of mortgage loan representations that BNY discovered, which would materially and adversely affect certificateholders. *Id.* at ¶ 11. Plaintiff notes that BNY was "presented with a large number of defaulted loans that were originated by the Sponsors . . . and foreclosures were often commenced in BNY Mellon's name." *Id.* at ¶ 97. Review of these fillings should have led BNY to learn that "borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law." *Id.* Plaintiff also alleges that BNY received notice of widespread Sponsor breaches from monoline insurers,[1] and that BNY was aware of trading downgrades and the high level of defaults. *Id.* at ¶ 100-111. Plaintiff claims that had BNY provided adequate notice "the obligated parties would have been required to cure the breaches or repurchase mortgage loans that did not comply with the applicable underwriting guidelines, and that ultimately caused a significant portion of Plaintiff's losses." *Id.* Plaintiff asserts that BNY

---

[1] "Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults . . . . Since 2009, monoline insurers, such as Ambac, MBIA, and Syncora, have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts." Am. Compl. ¶ 101-02, ECF No. 50.

4

knew or should have known that these breaches had occurred, and was also required to notify servicers when servicers breached the PSAs, which would have triggered the servicer's obligation to cure the breach. *Id.* at ¶ 11.

Third, BNY allegedly did not prudently exercise all available remedies once it had notice of both servicers numerous defaults and Events of Default under the PSAs, as well as breaches of mortgage loan representations and warranties. *Id.* at ¶ 12. Plaintiff claims that BNY notified Countrywide that many of the mortgage files for loans underlying the relevant securities had document exceptions and these exceptions were not cured; but, even after this notification, Countrywide and other sponsors did not substitute or repurchase the loans. *Id.* at ¶ 132. Plaintiff also asserts that BNY knowingly accepted false certifications from servicers who were required under the PSA to certify annually that they met their obligations under the PSAs and applicable federal regulations. *Id* at ¶ 135. Accordingly, Plaintiff concludes that had BNY "acted prudently, it would have issued repurchase demands years ago and, if necessary, commenced litigation forcing the Sponsors (or other obligated party) to repurchase defective loans or pay for losses." *Id.* at ¶ 12.

Fourth, BNY supposedly failed to provide accurate certifications and remittance reports, which were required under the PSAs and applicable federal law. *Id.* at ¶ 13. Plaintiff notes that BNY regularly made remittance reports available to certificateholders, but did not disclose any breaches it was aware of. *Id.* at ¶ 140. As a result, BNY mislead certificate holders and caused Plaintiff injury. *Id.* at ¶ 13.

Fifth, BNY purportedly failed to take steps to protect Plaintiff once it became aware of failures by servicers to cure problematic loans underlying relevant securities. *Id.* at ¶ 14.

Plaintiff asserts that servicers engaged in improper foreclosure practices wherein borrowers were charged improper and excessive fees, which were ultimately paid by certificateholders "because when a defaulting borrower's home is foreclosed . . . the Servicers deduct their fees . . . and any servicing advances from sale proceeds before any funds are transferred" to the trust. *Id.* at ¶ 145-147. Plaintiff claims BNY was or should have been aware of these "widespread servicing abuses" and, had they investigated, would have discovered that "the serious servicing abuses impacted the loans in the Covered Trusts." *Id.* at ¶ 148.

Accordingly, Plaintiff asserts three causes of action: (1) breach of contract for BNY failing to meet its obligations under the PSA; (2) violation of the Streit Act for BNY failing to "'use the same degree of care and skill in their exercise as a prudent [person] would exercise or use under the circumstances of [their] own affairs'"; and (3) violation of the TIA to provide certificateholders with notice of defaults within 90 days of becoming aware of such defaults and acting prudently to protect the rights of certificateholders during the period in which the default remains uncured. *Id.* at ¶¶ 16-18.

### III. Ratification

On March 11, 2010, Plaintiff sold the relevant Certificates as part of a resecuritization transaction, SSGM 2010-S1 (the Trust), and suffered over $440 million in losses. *Id.* at ¶ 152. The sale was made pursuant to a Trust Agreement between Plaintiff, Wilmington Trust Company (the Owner Trustee), and Citibank N.A. (the indenture trustee). *Id.* In granting Defendants' previous Motion to Dismiss, the Court held that after the sale, Plaintiff's claims travelled with the securities to the resecuritized trust and thus Plaintiff no longer had standing to bring the claims it asserted. *FDIC v. Citibank N.A.*, No. 1:15-CV-6560, 2016 WL 8737356, at *5

(S.D.N.Y. Sept. 30, 2016). The Court then granted Plaintiff leave to amend the complaint to resolve the standing issue through ratification by the Trust pursuant to Fed. R. Civ. P. 17(a)(3). ECF No. 47. In July 2017, Wilmington Trust sent Citibank an "Issuer Order" requiring Citibank to endorse Wilmington's ratification of this lawsuit. Am. Compl. ¶ 24, ECF No. 50. Citibank, however, refused to sign the ratification without first receiving indemnity. *Id.* at ¶ 26-27.

## STANDARD OF REVIEW

When considering a motion to dismiss for lack of subject matter jurisdiction under Fed R. Civ. P. 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). Where jurisdictional facts are at issue, "'the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *Id.* (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir.2003)). But, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000)).

On the other hand, when resolving a motion to dismiss under Fed. R. Civ. P 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

## DISCUSSION

The threshold issue is whether the Plaintiff has standing to bring suit. "[T]o have standing to bring suit, a plaintiff is constitutionally required to have suffered (1) a concrete, particularized, and actual or imminent injury-in-fact (2) that is traceable to defendant's conduct and (3) [that is] likely to be redressed by a favorable decision. *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 96 (2d Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (citing *Port Wash. Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 498 (2d Cir. 2007)). "'If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim.'" *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

In granting Defendants' previous motion to dismiss, the Court held that "under both New York and Delaware law, any claims that Plaintiff might have held travelled with the bonds when they were transferred by Plaintiff" as a result of the resecuritization transaction, and thus, Plaintiff lacked "standing to bring claims arising out of the certificates." *FDIC*, 2016 WL 8737356, at *5. Under Fed. R. Civ. P. 17(a)(3), however, a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Accordingly, Plaintiff sought to receive ratification of its lawsuit from the real party in interest: the Resecuritization Trust. Though the Owner Trustee, Wilmington Trust, ordered the indenture trustee, Citibank, to endorse Wilmington's ratification of the lawsuit, Citibank refused absent an indemnification it deemed satisfactory.

In light of Citibank's refusal to ratify, Defendant argues that Plaintiff has no standing to bring this lawsuit. Def. Mem. Supp. Mot. Dismiss 6-9, ECF No. 65. Plaintiff, relying on its interpretation of the Indenture Agreement and on principles of equity, requests instead that the Court "either (1) hold that the ratification of the Owner Trustee is sufficient because the Owner Trustee represents the real party in interest or because Citi is prevented from relying on its own failure to follow the Issuer Order with no legitimate rationale for refusing to do so, or (2) order Citi to endorse the ratification of the Owner Trustee as contractually required (the equitable remedy of specific performance)." Pl. Opp. Mot. Dismiss 9, ECF No. 67. In support of its position Plaintiff argues, *inter alia*, that Citibank provided no justification for its decision to not ratify the lawsuit, including why the indemnity it is guaranteed under the Indenture is inadequate; that the Indenture requires Citibank to perform its contractual duties notwithstanding

9

receipt of indemnity; and that under the "prevention doctrine" Defendants cannot take advantage of a condition precedent (i.e., a signed ratification), the performance of which Defendants can render impossible (per Citibank's refusal to sign), to avoid Citibank's duty to follow Wilmington Trust's order to ratify the lawsuit. *Id.* at 4-9.

"The district court has discretionary authority to determine whether ratification is appropriate in a given case." *Motta v. Res. Shipping & Enterprises Co.*, 499 F. Supp. 1365, 1371 (S.D.N.Y. 1980). Discretion, however, "must be exercised in a manner consistent with [Rule 17's] purpose to protect the defendant from subsequent litigation and to finally resolve the dispute at hand." *Id.* The Court holds that Plaintiff lacks standing because the real party in interest has not ratified the lawsuit. As noted above, the Court is permitted to look beyond the four corners of the Complaint to resolve any factual disputes regarding jurisdiction. *Tandon*, 752 F.3d at 243. The facts, however, are not in dispute—Citibank has not ratified this lawsuit. Accordingly, the Court holds that standing has not been established.

To save its case, Plaintiff has asked the Court to evaluate Citibank's underlying contractual obligations, which it asserts warrants a finding of ratification or the remedy of specific performance. But, the Court's role in deciding a motion to dismiss is to determine whether the allegations *in the complaint* are legally sufficient. *Goldman*, 754 F.2d at 1067 (2d Cir. 1985). Plaintiff cites no authority holding that a district court can (or should) determine the legal sufficiency of allegations unrelated to the original complaint that a plaintiff raises in opposition to a motion to dismiss. Nor does Plaintiff cite any authority holding that a district court resolving a motion to dismiss under 12(b)(1) or 12(b)(6) can conclude as a matter of law that a contract was breached or if remedies, such as specific performance are warranted. *See*

*generally Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, No. 04CIV10014PKL, 2005 WL 1950116, at *7 (S.D.N.Y. Aug. 12, 2005) (in resolving a motion for judgment on the pleadings the district court held that "[b]reach of contract is a complicated, fact-based analysis, more so when a party alleges that equity requires specific performance . . . [T]he Court defers its decision on what remedies are due . . . until the facts are sufficiently culled and this issue receives the full benefit of the parties' legal analysis.").

Absent law that suggests otherwise, the Court declines to resolve the contractual dispute surrounding Citibank's decision to not ratify this lawsuit. As Plaintiff's lack of standing deprives the Court of subject matter jurisdiction, the Court declines to reach the merits of the Complaint. Plaintiff's Complaint is dismissed without prejudice. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994) ("[D]ismissals for lack of subject matter jurisdiction are not on the merits and are not accorded res judicata effect.") (citing *Exch. Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1130-31 (2d Cir. 1976)).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is **GRANTED**.

**SO ORDERED.**

**Dated: March 20, 2019**
  **New York, New York**

_____
ANDREW L. CARTER, JR.
**United States District Judge**